UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES

-v-

CARLOS URENA,

                Defendant.

------------------------------------------------------------X

11 Cr. 1032-4 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    This decision resolves a petition by defendant Carlos Urena, under 28 U.S.C. § 2255, to vacate his conviction and sentence. In March and April 2014, the Court presided over an eight-week jury trial of Urena and a co-defendant, Limet Vasquez. Urena and Vasquez were among 76 people charged in a superseding indictment with crimes—including numerous acts of violence—committed in connection with their membership in, and/or association with, a violent street gang known as the Bronx Trinitarios. *See, e.g.*, Dkts. 4, 401, 539.

    The central event on which Urena's trial pivoted was the savage murder in Yonkers, New York, on the night of September 3, 2005, of Ka'Shawn Phillips, aged 16, whom the Trinitarios attacked in retaliation for a fight the previous night with a Trinitarios member. The evidence at trial, which included testimony from seven cooperating witnesses, overwhelmingly showed that Urena was part of a swarm of Trinitarios that set upon Phillips—stabbing, beating, and shooting him—and that Urena personally fired the shot into Phillips' head that killed him. On April 29, 2014, Urena was convicted on all charges, including racketeering, conspiracy to commit racketeering, and the murder in aid of racketeering of Phillips. The last of these offenses carried

a mandatory sentence of life imprisonment. On January 7, 2015, the Court sentenced Urena principally to a term of life imprisonment. Dkt. 1596.

In his petition, Urena claims that the Government, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, withheld favorable evidence material to the case against Urena, namely, a post-arrest statement by a Trinitarios member, Angel Hernandez, denying that he (Hernandez) had participated in the Phillips murder. Urena notes that, although Hernandez did not testify at trial, Hernandez's claim of non-participation in the Phillips murder is inconsistent with the trial testimony of a Government cooperating witness, Jose Diaz, who recalled that Hernandez was among the Trinitarios present at the murder. The Government opposes Urena's petition, on the ground that Hernandez's denial of his own participation was immaterial to Urena's case, and therefore was not required to be disclosed to the defense, and that, in any event, the non-disclosure of Hernandez's self-exculpatory statement did not prejudice Urena. For the following reasons, the Court agrees, and denies Urena's petition.

## I. Background

### A. Facts Relevant to the Petition[1]

The Trinitarios Gang was formed in the New York state prison system in the early 1990s, originally with the purpose of protecting inmates of Dominican origin. Gang members engaged in various crimes within prison, including using weapons and distributing narcotics. Eventually, the gang spread outside of prison, and was centered in the New York City area. To solidify the gang's influence, Trinitarios members and associates committed crimes, including murders, attempted murders, and other acts of violence, directed largely at rival gang members or

---

[1] The facts presented herein are drawn from the evidence at Urena's trial. The Court presents here only the facts most relevant to Urena's petition. As used here, "Tr." refers to the trial transcript.

dissident factions within the gang. To fund the gang's operations, members also distributed a wide range of illegal narcotics and committed robberies.

Although there was substantial corroborative evidence of Urena's participation in the Bronx Trinitarios gang and in various acts of violence on its behalf, the heart of the proof at trial was testimony from seven cooperating witnesses who had been members of the gang. Because of their admitted involvement in the Phillips murder and their implication of Urena in it, five are particularly relevant to this motion: Diaz (a/k/a "Joselito"), Jose Cruz (a/k/a "Prostituto"), Juan Franco (a/k/a "Juan Carlo"), Alexander Toribio (a/k/a "Campe"), and Juan Nunez (a/k/a "Jesu Christo"). *See* Tr. 1164–93 (Diaz), Tr. 1907–32 (Cruz), Tr. 2835–42 (Franco), Tr. 2987–3010 (Toribio), and Tr. 3852–73 (Nunez). Of these, Diaz, Cruz, and Nunez testified that they were members of the Bad Boys, a particularly violent and retributive group within the Bronx sect of the Trinitarios. These witnesses, and others, collectively testified about dozens of acts of violence—many of them shockingly bloodthirsty and wanton—that they and others committed in connection with their membership in the gang in general, and the Bad Boys in particular. *See, e.g.*, Tr. 1204–19, 1305–20 (Diaz); Tr. 1940–92, 2013–99 (Cruz); Tr. 3207–3304 (Ballenilla); Tr. 3813–29, 3836–52 (Nunez). Urena (a/k/a "Salcedo" and "White Boy") was implicated in a number of these acts, including as an active assailant.

One such act was the 2005 Phillips murder, in the vicinity of 78 Saratoga Avenue in Yonkers. The trial evidence conclusively proved that Phillips was murdered by a group of Trinitarios gang members who targeted him, chased him, stabbed him more than 20 times, beat him, and shot him twice. The motive for the attack on Phillips, whom the Trinitarios believed to belong to the Bloods, a rival gang, was to retaliate for his role in a brawl the previous evening (September 2) with members of the Trinitarios' Yonkers affiliate. In a meeting the evening of

September 3, Yonkers members asked the Bronx Trinitarios, on their behalf, to exact revenge against Phillips. The Bronx members (mostly members of the Bad Boys) agreed to do so.

The evidence revealed in detail how the Phillips murder was planned and executed, including the roles played in it by Urena and Vasquez. Each of the five cooperating witnesses named above admitted to participating in the Phillips murder. And each had pled guilty, pursuant to a cooperation agreement, to (among other crimes) murder in aid of racketeering in connection with the Phillips murder.

Specifically, each of these witnesses testified that, on the evening of September 3, 2005, a meeting was held in Van Cortlandt Park, involving 10 or more gang members. The Yonkers Trinitarios who were present asked the Bronx members to retaliate against Phillips for a brawl the night before between Phillips and a Yonkers Trinitarios member, Juan Martinez, on or near Saratoga Avenue. *See, e.g.*, Tr. 1171–72 (Diaz), Tr. 1907–09 (Cruz), Tr. 2835–36 (Franco), Tr. 2988–93 (Toribio), Tr. 3853–54 (Nunez). The Yonkers members, who included Martinez, explained that they could not directly participate in the attack on Phillips, lest they be recognized by their Yonkers neighbors. *See, e.g.*, Tr. 3860 (Nunez) ("Q: Was anything said about why they were in a different position than the Bad Boys in terms of getting caught? A: Yes, because we were from the Bronx and they didn't know us, and they were right—I believe they were from the same hood. They were right up the block from the situation. Q: The same neighborhood as where the attack was going to take place? A: Yes."). The Bronx Trinitarios agreed to attack Phillips in retaliation. The cooperating witnesses uniformly identified Urena as part of this group.[2]

---

[2] Nunez, for example, testified that Urena was at the Van Cortlandt Park meeting, and volunteered to join the group that traveled to Yonkers to attack Phillips. *See* Tr. 3854 ("Q: Who

4

Between seven and 10 Bronx Trinitarios members then traveled, in two cars, to Yonkers. Martinez and the other Yonkers Trinitarios drove in a Jeep and led the way. Most of the Bronx Trinitarios followed in a van stolen (and driven) by Diaz. *See, e.g.*, Tr. 1911–13 (Cruz). The Trinitarios brought an array of weapons with them, including knives, a machete, bags of rocks, and two guns, one of which, a 9 millimeter firearm, was passed to Urena.

Once the two cars arrived in Yonkers, these witnesses testified, the Yonkers Trinitarios pointed out Phillips to the Bronx Trinitarios as the person to be attacked. The car driven by the Yonkers affiliates then parked on Elinor Place, some distance south of where Phillips had been standing, at or near 78 Saratoga Avenue. While the Yonkers affiliates, including Martinez, waited by their car, the Bronx Trinitarios exited their car, charged towards Phillips, and carried out the fatal attack. *See, e.g.*, Tr. 1189–90 (Diaz), Tr. 1921–30 (Cruz), Tr. 2837–39 (Franco), Tr. 2997–3007 (Toribio), Tr. 3867–70 (Nunez). The evidence further established that two Trinitarios members shot Phillips. The first shot multiple times in Phillips' direction, wounding him in the chest but not killing him. Several Trinitarios then swarmed the wounded Phillips, stabbing and beating him viciously as he lay on the sidewalk. The second shooter then shot Phillips point-blank in the head, killing him.

The trial testimony of the five cooperating witnesses was uniform in identifying Toribio, or "Campe," as the first shooter. Toribio himself admitted and testified to this crime. *See* Tr. 2998–3004. All five witnesses also identified Urena as the second, fatal shooter. *See, e.g.*, Tr. 1919 (Cruz) ("Q: Who, if anyone, had the gun at the time of the murder? A: *Salcedo*. Q: How

---

do you remember being at this meeting? A: Me, *Salcedo*, Blood, Campe, Prosti, Percha, Juan Carlo, Fantasma, Fresh, Sony, Joselito, Boquita, Trencita, and various other members of the Bad Boys set.") (emphasis added); Tr. 3860 ("I was one of the individuals that volunteered to go. *Salcedo* volunteered, Prosti. Me, *Salcedo*, Prosti, Blood, Juan Carlo, Fresh, Fantasma, Joselito already had the car, and Campe.") (emphasis added).

5

do you know that? A: Because I saw him shooting it.") (emphasis added). In between these two gunshots, other participants in the attack, including Cruz and Nunez, stabbed and/or struck Phillips while he lay on the ground.

After Phillips was murdered, the Bronx Trinitarios returned to the stolen van driven by Diaz. Cruz testified that Urena passed him the gun so he could put the safety on and that they drove away together in the van. *See* Tr. 1930–31. Several cooperating witnesses also testified that Urena made statements following the murder acknowledging his role as the second, and fatal, shooter.

### B. History of Urena's Petition

On January 5, 2016, just under a year after his sentencing, Urena, through his trial counsel, filed a § 2255 petition challenging his sentence, on the sole ground that the Government had violated its *Brady* obligations by failing to disclose before and during trial the fact that, in a post-arrest statement, Hernandez—whom Diaz testified was among the Trinitarios members who had been present for the murder—had denied any involvement. *See* Dkt. 1864.

As Urena recounted, on February 11, 2014, approximately one month before Urena's trial began, Hernandez had been arrested in Florida and charged with the Phillips murder, pursuant to a sealed complaint filed in this District. Upon arrest, Hernandez waived his *Miranda* rights and answered questions put to him by the arresting officers. Relevant here, Hernandez denied any involvement in the murder. The Government, however, did not disclose this denial (or Hernandez's other statements) to Urena before or during trial.

In support of his petition, Urena filed an affirmation from counsel, Dkt. 1865 ("Cooper Aff."), and a supporting brief, Dkt. 1886 ("Urena Br."). On February 2, 2016, the Government

filed an opposition brief. Dkt. 1892 ("Govt. Br."). On March 4, 2016, Urena filed a reply. Dkt. 1910 ("Urena Reply").

Since filing the § 2255 petition, Urena has raised the same *Brady* claim on direct appeal, where it is now fully briefed. *See* Dkt. 1940. The Government does not take a position on whether the Court should defer resolving the § 2255 motion until the direct appeal has been decided, *see id.* at 2, and Urena, for his part, is silent on the issue. As the Government acknowledges, Urena's § 2255 petition may present his claim in a more favorable procedural posture, because a plain error standard will apply on his direct appeal. *See id.* (citing *United States v. Vilar*, 645 F.3d 543, 548 (2d Cir. 2011)).

## II. Applicable Legal Standards

Section 2255 allows a prisoner held in federal custody to collaterally challenge his federal conviction or sentence. To obtain relief under § 2255, a petitioner must establish "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). Section 2255 is not, however, a substitute for direct appeal. *See Sapia v. United States*, 433 F.3d 212, 217 (2d Cir. 2005).[3]

---

[3] In ruling on a § 2255 petition, a district court must hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "However, the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Id.* Neither party has sought a hearing here or contends that one is necessary. The Court agrees.

In *Brady*, the Supreme Court held that withholding exculpatory evidence violates due process where the evidence is material to a defendant's guilt or punishment. To establish a *Brady* violation, a defendant must show that: (1) the Government suppressed evidence, whether willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence was material, *i.e.*, it resulted in prejudice to the defendant. *Lewis v. Conn. Comm'r of Correction*, 790 F.3d 109, 123 (2d Cir. 2015). Suppressed evidence is material only if there is "reasonable probability of a different result" had the suppressed evidence been made available. *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

The Supreme Court has held that "the duty to disclose exists irrespective of whether the information bears on the defendant's innocence or a witness's impeachment." *Fuentes v. Griffin*, No. 14-3878, 2016 WL 3854206, at *9 (2d Cir. July 15, 2016) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *see also Giglio v. United States*, 405 U.S. 150 (1972). Whether the non-disclosure of impeachment evidence results in a *Brady* violation turns heavily on the strength of the independent (*i.e.*, non-compromised) evidence of guilt. "In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) (per curium). In contrast, where there is "considerable forensic and other physical evidence," modest impeachment evidence will not create reasonable probability of a different result. *Strickler v. Greene*, 527 U.S. 263, 293 (1999). In sum, as the Second Circuit

has put the point, "the existence of substantial independent evidence of guilt is unavoidably relevant to whether withheld impeachment evidence can reasonably call the jury's verdict into question." *United States v. Orena*, 145 F.3d 551, 558 (2d Cir. 1998).

"[A] materiality analysis requires a careful, balanced examination of the nature and strength of the evidence presented, as well as an evaluation of the potential impact of the evidence on the witness's credibility." *Fuentes*, 2016 WL 3854206, at *11. Impeachment evidence may be cumulative because it "merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence," *Avellino*, 136 F.3d at 257, or it may be immaterial because the impeached witness's testimony is otherwise corroborated. *See United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995).

### III. Discussion

At the threshold, the Court considers whether to resolve Urena's claim now or to wait until the Second Circuit has resolved his parallel claim on direct appeal. The Court has the discretion to proceed either way, as "there is no jurisdictional bar to a district court's adjudication of a § 2255 motion during the pendency of a direct appeal." *United States v. Outen*, 286 F.3d 622, 632 (2d Cir. 2002) (emphasis omitted).

Here, there is obvious systemic benefit from the Court's addressing Urena's claim. The Court, having presided over trial, is uniquely situated to assess the critical question of whether Hernandez's denial of participation in the Phillips murder was material to Urena's defense such that its nondisclosure prejudiced him. The Court's assessment of this fact-intensive issue may assist the Second Circuit in its evaluation. The Court therefore addresses Urena's petition now.

It is undisputed that Hernandez's denial of his own participation in the Phillips murder, had it been received in evidence at Urena's trial, would have been favorable evidence for Urena. To be sure, its principal value would have been to impeach a single cooperating witness, Diaz. Hernandez did not, at all, exculpate Urena (or, indeed, anyone other than Hernandez himself) for the Phillips murder. Nor did Hernandez articulate an account of the murder inconsistent with Urena's participation. Rather, Hernandez denied having anything to do with the murder. But, insofar as Diaz recalled at trial that Hernandez had participated in the Van Cortlandt Park meeting, Hernandez's denial of having done so had potential to undermine Diaz's testimony that Hernandez had been present. And Urena's counsel's defense at trial largely consisted of aggressively cross-examining the Government's cooperating witnesses to illustrate that they were compromised and hence incredible. Notably, while the Government disputes the materiality of Hernandez's denial of participation, it acknowledges that it should have disclosed that denial to the defense. *See* Govt. Br. 2–3 ("[T]he Government should and would have produced the information concerning Hernandez's arrest and post-arrest statements . . . had it recognized or anticipated, as Urena now explains, how Urena might have used that information at trial.").

For the two independent reasons reviewed below, however, the Court holds that this information was clearly immaterial to Urena's trial defense. The Court's firm assessment is that there is no possibility, let alone a reasonable probability, that the outcome of Urena's trial would have been any different had the Government disclosed Hernandez's statement denying participation. Accordingly, whether one views the Government's failure to disclose Hernandez's statement as no due process violation at all (because the due process clause requires only that

10

material evidence favorable to the defense be disclosed) or as a non-prejudicial violation, Urena is not entitled to relief under § 2255.

### A. Inadmissibility of Hernandez's Out-of-Court Statement

First, whatever its theoretical value, Hernandez's out-of-court self-exculpatory statement was, in practice, inadmissible. Urena has not articulated any coherent theory under which that statement could have been received for the truth of the matter asserted by Hernandez. Hernandez was not, for example, a party-opponent of Urena's. And his denial of guilt was not a statement in furtherance of a conspiracy. *See* Fed. R. Evid. 801(d)(2). Nor has Urena has articulated any viable theory under which the statement could have been received for some other limited purpose (and if so, why the statement, if offered other than for the truth of the matter asserted by Hernandez, would have had any value to Urena in impeaching Diaz).[4]

Urena also does not argue that, if notified of the post-arrest statement, he would have secured Hernandez as a trial witness. Any such claim would have been implausible: With Hernandez having been charged in this District with participating in the Phillips murder, it is all but a foregone conclusion that, if called to testify, he would have invoked his right against self-incrimination. Thus, whatever the theoretical value of putting the fact of Hernandez's denial before Urena's jury, Urena has failed to articulate any credible theory under which he could have done so.

---

[4] As the Government aptly notes in its brief on Urena's appeal, there is no rule of evidence that "would have permitted defense counsel to ask a cooperating witness if he knew that another defendant in the case had denied involvement in the crime or denied recollection of certain facts." Case No. 15-118, Dkt. 129, at 48.

11

### B. Immateriality of Hernandez's Denial of Participation

Second, and more important, even if Hernandez's denial of participation had been put before Urena's jury, in the context of the case, it would not have created reasonable doubt, or even come close to doing so. That is so for two reasons: (1) The independent evidence at trial of Urena's guilt was overwhelming, and (2) Hernandez's post-arrest statement added at most negligible (and cumulative) ammunition to the material available to, and used by, the defense to try to impeach Diaz.

#### 1. Independent Evidence of Guilt

The evidence at trial included "substantial evidence of [Urena's] guilt entirely unrelated to the withheld impeachment evidence." *Orena*, 145 F.3d at 558. All five cooperating witnesses were uniform in their account of the critical elements of how the Phillips murder unfolded. These included (1) the meeting at Van Cortlandt Park planning the attack, (2) the drive in two cars to Saratoga Avenue, (3) the identification by the Yonkers gang members to the others of Phillips as the target of the imminent attack, (4) Toribio's firing the first, non-fatal, shots at Phillips, (5) the swarming attack on Phillips by various Trinitarios, and (6) Urena's firing the final shot into Phillips' head.

Even assuming that Diaz's testimony were eliminated in its entirety, the other four cooperating witnesses (Cruz, Franco, Nunez, and Toribio) convincingly implicated Urena as a central participant in the plot and the attack, and as the shooter in the murder. *See, e.g.,* Tr. 1919 (Cruz) ("Q: Who, if anyone, had the gun at the time of the murder?  A: Salcedo.  Q: How do you know that?  A: Because I saw him shooting it.").[5] And there was no persuasive evidence

---

[5] *See also* Tr. 1928 (Cruz) ("Q: Did you have a conversation with Mr. Urena about the incident that evening?  A: Yes.  Q: What did he say to you?  A: That he had shot him [Phillips] in the

presented at trial to rebut the testimony that he was the second shooter. As to the central elements of the murder, these witnesses convincingly reinforced one another's testimony. The credibility of their accounts was buttressed by other proof at trial (*e.g.*, forensic testimony about the location of bullet shells, and coroner's office testimony about the specific injuries inflicted on Phillips). Moreover, their accounts were of a piece with the overwhelming evidence at trial of Urena's participation in, and lead role in, other acts of brutal retaliation against perceived rivals of the gang. Having presided over the lengthy trial, the Court is confident in assessing that the jury would have convicted Urena even if the jury had set aside Diaz's testimony in its entirety. Urena articulates no coherent basis for concluding otherwise.[6]

### 2. Limited Non-Cumulative Impeachment Value

Hernandez's denial of participation in the Phillips attack had very limited impeachment value, if any. For a host of reasons, it is unlikely, to say the least, that a jury that learned of that denial would have discredited Diaz's testimony about Urena's role in the Phillips murder.

---

head."); Tr. 2839 (Franco) ("Q: You saw Mr. Salcedo shoot at the person with the red shirt? A: Yes."); Tr. 3009 (Toribio) ("Q: After the murder, did you have a conversation with the defendant Carlos Urena? A: Yes, sir. Q: And what did he say to you? A: That he had shot the person in the head."); Tr. 4095 (Nunez) ("Q: After you say Carlos Urena shoots Ka'Shawn Phillips at the time . . . where were you? A: At the time he shot Ka'Shawn Phillips while he was on the floor, I was right over Ka'Shawn.").

[6] Urena posits that had he learned of Hernandez's arrest in Florida, he would have attempted to construct a narrative for the jury implying that Hernandez and Toribio—who late in February 2014 was arrested elsewhere in Florida—met and concocted the account of Urena's participation in the Phillips murder. There is no basis for this fantastical conjecture and no reason whatsoever to assume that a rational jury would have credited it. As the Court earlier ruled in denying Urena's post-trial bid for discovery into this theory, Urena's "theory of ostensible exculpation . . . is conjectural, unsupported, and far-fetched. It is also at odds with overwhelming independent evidence adduced at trial of Urena's guilt." Dkt. 1844.

First, to note the obvious, a jury might well assign little or no weight to Hernandez's self-serving post-arrest denial of participating in a murder.

Second, even if it credited that denial, there were good reasons for a jury to not view Diaz's mistake on that point as casting doubt on Diaz's other testimony, including the important testimony as to Urena. Significantly, Diaz did not claim to have known Hernandez well before the murder; he had seen Hernandez—whom he knew as "Joel"—only once before, during a fleeting traffic incident. *See* Tr. 1172–73. His trial identification of Hernandez consisted of identifying a photograph of Hernandez as depicting a participant and not a significant one—in the Van Cortlandt Park meeting at which the attack was planned. Also, in the same post-arrest statement in which he denied participation in the Phillips attack, Hernandez stated that he had often been confused with his half-brother, Juan Martinez, who undeniably was at the Van Cortlandt Park meeting and at the murder scene.[7] (Indeed, Martinez was the one who instigated the retaliatory attack, as he had brawled the day before with Phillips. Martinez also drove to Yonkers with the Bronx Trinitarios and pointed out Phillips to them. All of the cooperators identified Martinez as the instigator and as present at the murder, even if they did not all know his name.)

Third, as the Government chronicles in its brief, there were numerous contradictions among the five cooperator witnesses as to the *particulars* of the attack, which, as of the time of trial, had occurred more than eight-and-a-half years earlier. For example, the five witnesses did

---

[7] Diaz did not explicitly testify that Hernandez accompanied the other gang members from Van Cortlandt Park to Saratoga Avenue; he testified that Campe and "two of the Yonkers Trinitarios"—including Martinez, whose actions at the murder scene Diaz later described—got into the lead vehicle. Tr. 1181. The Court assumes, however, that the other Yonkers Trinitario to whom Diaz was referring was Hernandez.

14

not agree about whether certain Trinitarios were present or not.[8] Indeed, Diaz's testimony that Hernandez participated was already at odds with that of the other four, none of whom pinpointed Hernandez as a participant. In summation, counsel for both defendants, in asking the jury not to credit the cooperators, hammered home inconsistencies in their testimony and with other evidence.[9] The jury nonetheless convicted Urena of the murder (while finding Vasquez to have conspired to commit murder, but not having committed it). Urena's notion that revelation of one more minor discrepancy (Diaz's purportedly inaccurate claim that Hernandez was present for the murder) would have tipped the scales as to his murder conviction is quite unconvincing.[10]

---

[8] *Compare* Tr. 1913 (Cruz) *and* Tr. 4062 (Nunez) (denying that a gang member named D Grate participated in the murder), *with* Tr. 1532 (Diaz) (testifying that D Grate was in the van he drove to the murder); *compare also* Tr. 1167 (Diaz) and Tr. 1907 (Cruz) (identifying a Trinitario named Soriano as the leader of the meeting in Van Cortlandt Park), *with* Tr. 4060–61 (Nunez) (testifying that Soriano was not at the meeting).

[9] In closing argument, Urena's counsel noted inconsistencies among cooperators regarding the participants in the attack ("Boquita is there. . . . No, he's not, says Franco. . . . And then Jesu Christo. Yes, he was there. Maybe he was there. No, he wasn't there. Take your pick."); the location of the planning meeting ("We know, according to four of the five people, the meeting took place in Van Cortlandt. Of course, according to Campe, who remembers everything so well, maybe it was Van Cortlandt or maybe it was in some other park in the Bronx."); the identity of the gang member who ran the meeting ("Says Diaz, Soriano. . . . Says Prosti, Soriano. Says Nunez, who? He wasn't there. What are you talking about? But that's OK because Campe ran the meeting."); and how it was decided who would travel to Yonkers ("Which way do you want? Do you want to have everybody volunteered? We have that version. Do you want to have everybody who was chosen? We have that version. . . . Everybody has a different version of what happened."). *See* Tr. 5038–40. Most fundamentally, Urena's counsel argued that all cooperators were wrong in pegging Toribio as the first shooter, noting other evidence suggesting that Juan Martinez had played that role. On that ground, counsel argued that there was reasonable doubt as to who the second shooter had been. *See* Tr. 5043 ("[H]ow much more inconsistent can you get than people who were there saying, Juan Martinez, and the government cooperator saying, what are you talking about?").

[10] At trial, the Government itself conceded to the jury that Diaz's testimony was not "a hundred percent accurate." *See* Tr. 5155. Accordingly, any additional impeachment would have "merely furnishe[d] an additional basis on which to challenge [Diaz]." *Avellino*, 136 F.3d at 257. It would therefore have been cumulative and not material.

15

Finally, the jury was given ample other grounds to impeach Diaz's testimony (and that of the other cooperators). Each was subject to a written cooperation agreement; each stood to gain sentencing leniency and to avoid a potential life sentence by virtue of his cooperation; and each admitted to a variety of other crimes.[11] Diaz, for example, admitted to participating not only in the Phillips murder, but also in numerous acts of violence, and narcotics trafficking, as a member of the Trinitarios. Diaz also had a blemished disciplinary history while incarcerated. *See* Govt. Br. 28. In the face of this impeachment material, the jury nevertheless convicted Urena. Therefore, at most, the additional impeachment material supplied by Hernandez's denial of his own guilt would have been cumulative.[12]

## CONCLUSION

For the reasons set forth above, the Court denies Urena's § 2255 petition. The Clerk is directed to close the motion pending at docket number 1864.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: August 8, 2016
New York, New York

---

[11] In summation, Urena's counsel argued numerous times that the cooperators were motivated to testify in order to receive leniency at sentencing. *See, e.g.*, Tr. 5028, 5031, 5034, 5036, 5043.

[12] The Government's brief opposing Urena's § 2255 petition recites other bases on which to find Hernandez's post-arrest statement immaterial. Those additional arguments generally have merit. The Court has focused here on what it regards as the central bases for finding immateriality, but does not purport to be comprehensive on this point.